UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
BALESTRIERE PLLC,
                              :
            Plaintiff,            <u>MEMORANDUM & ORDER</u>
                              :
      -against-                  11 Civ. 9459 (MHD)
                              :
CMA TRADING, INC. and GUNTHER
"GUS' EBEN,
            Defendants.    :
------------------------------x
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:


      Plaintiff Balestriere PLLC ("plaintiff"), a law firm located

in New York City, commenced this diversity lawsuit against its

former clients, defendants CMA Trading, Inc. ("CMA") and Gunter

"Gus" Eben ("Eben"). It asserted various state-law claims arising

from its representation of CMA and its contemporaneous related

business dealings with defendants. The parties consented to the

jurisdiction of a magistrate judge under 28 U.S.C. § 636(c).


      Currently before the court are applications by plaintiff for

(1) a <u>quantum</u> <u>meruit</u> award of legal fees to be paid by CMA for

plaintiff's representation of it in connection with a lawsuit and

with the transactions of an apparently fictional commodities

trading business and (2) for a separate Rule 37 award against Eben,

representing the expenses of a sanctions motion by plaintiff for

1

his spoliation of documents. Plaintiff seeks an award against CMA of $638,559.51 and an award of $10,260.00 against Eben. For reasons to be discussed, we conclude that the quantum meruit value of plaintiff's services is $150,215.99, but since plaintiff has already received $252,000.00 in payouts for these services, CMA owes it no additional amount. We award plaintiff $3,802.50 in motion expenses as against Eben.


## PROCEDURAL BACKGROUND


In plaintiff's complaint, it asserted a potpourri of claims against CMA and Eben, including breach of contract, quantum meruit, fraud and various other tort theories. These claims arose from a contractual relationship that plaintiff and defendants had entered into in 2010, under which plaintiff was to provide legal services to CMA and the parties were to share revenues from commodities transactions supposedly to be engineered by defendants.  According to plaintiff, it was induced to enter into the relationship with CMA and to provide services to it as a result of falsehoods by Eben about the bona fides of CMA as a company engaging in commodities transactions. Plaintiff further complained that the services that it rendered to defendants unwittingly had aided them in defrauding several investors, thus exposing the law firm, as well as CMA and

2

Eben, to liability to the investors.[1] Plaintiff also complained that defendants had failed to pay fees generated by the services that the law firm had provided to them.

By endorsed order dated May 7, 2013, we entered a default against CMA based on its failure to hire counsel. At the same time we declined to enter judgment against the company, since plaintiff had failed to make any showing as to the amount of its damages, if any, or as to the evidentiary grounding for any other relief that it might be seeking.

At the completion of discovery, plaintiff moved formally for a default judgment against CMA, for spoliation sanctions against Eben, and for summary judgment against Eben on four of plaintiff's claims, encompassing fraud, quantum meruit, unjust enrichment and defamation. We denied plaintiff's default-judgment motion since the movant had failed to proffer the evidence that would support its application for a specific monetary award, but we authorized an inquest on damages. Balestriere, 2014 WL 929813 at *2-3. We granted plaintiff's motion for spoliation sanctions against Eben,

---

[1] The claims of the investors, who appeared in this case as intervenor plaintiffs, were ultimately dismissed for lack of subject-matter jurisdiction. Balestriere PLLC v. CMA Trading, Inc., 2014 WL 929813, *1 (S.D.N.Y. March 7, 2014).

concluding that it should be awarded a mandatory inference "that CMA had little or no revenue from close-out sales, and that to the extent that Eben may have testified otherwise, his testimony was untruthful." <u>Id.</u> at *3-5. Finally, we denied plaintiff summary judgment on any of its claims against Eben for lack of a sufficient evidentiary showing. <u>Id.</u> at *7-18.

In the wake of these rulings, plaintiff has filed its current application. It asks for a default judgment against CMA in the amount of $638,559.51. This figure is said to represent (1) the <u>quantum</u> <u>meruit</u> measure of the value of the services that the Balestriere firm rendered to CMA until the termination of the attorney-client relationship on June 30, 2011, (2) less $252,000.00 already received by the firm, (3) plus 9% prejudgment interest from June 30, 2011 to March 24, 2014.[2] (Balestriere Aff. ¶ 21). Plaintiff seeks as well an award against Eben of $10,260.00 in attorney's fees and expenses attributable to its successful

---

[2] Plaintiff concedes that it received $252,000.00 to offset some of the fees engendered by its representation of CMA. All but $2,000.00 of this amount represents escrowed investment moneys received from the allegedly defrauded investors and arguably placed in an escrow fund by the plaintiff law firm. (Affidavit of John Balestriere in Support of <u>Quantum</u> <u>Meruit</u> Claim Assessed Pursuant to Rule 55(b)(2) Inquest and in Support of Attorney's Fees Due to Spoliation ("Balestriere Aff."), Doc. 210, ¶¶ 13, 34-37).

4

sanctions motion against that defendant. (Balestriere Aff. ¶ 58). Defendants, although given the opportunity to respond to these applications, have failed to do so.


## ANALYSIS


We first address the issues raised on the damages inquest and then assess plaintiff's application for motion expenses.


## I. Plaintiff's Quantum Meruit Application
### A. General Standards on Default


Plaintiff's application for an award of damages against CMA is predicated on the default entered against that company last year. A defendant's default is deemed to constitute a concession of the well-pled allegation of the complaint pertaining to liability, see, e.g., Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), and the party moving for a default judgment is entitled to "all reasonable inferences in its favor." Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009)(citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981). That said, the court must determine whether the factual allegations in the complaint actually state a viable claim, and it retains the

discretion "to require proof of necessary facts and need not agree that the alleged facts constitute a valid cause of action." Id. at 84. Furthermore, the moving party retains the burden of demonstrating by competent evidence the factual basis for its demands for relief, including its provable damages. Greyhound, 973 F.2d at 158. In making the necessary record, the court may choose to proceed by way of an evidentiary hearing or by submission of affidavits and exhibits. See, e.g., Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 53-54 (2d Cir. 1993). In this instance, plaintiff is proceeding by submission of such papers. (Balestriere Aff.; Affidavit of Marc J. Natale in Support of Quantum Meruit Claim Assessed Pursuant to Rule 55(b)(2) Inquest and in Support of Attorney's Fees Due to Spoliation ("Natale Aff."), Doc. 211).

### B. The Quantum Meruit/Lodestar Standards

The underlying legal theory on which plaintiff's current application is premised is quantum meruit, that is, the value of the benefit that plaintiff provided to the defendants. See, e.g., Balestriere, 2014 WL 929813 at *3 (citing cases). As suggested by plaintiff's reliance solely on its time records and representations as to its ordinary billing rates, it assumes that the appropriate analysis of the value of the benefit conferred should be based on

the so-called lodestar form of analysis. In general terms a lodestar approach may be useful, but, as we note below, that approach must be modified to a substantial degree in the unusual circumstances of this case. See discussion infra page 15-16.

Under New York law, a quantum meruit analysis of the reasonable value of uncompensated legal services fees is left to the discretion of the trial court. Sequa Corp. v. GBJ Corp., 156 F.3d 136, 148-49 (2d Cir. 1998)(citing Chernofsky & DeNoyelles v. Waldman, 212 A.D.2d 566, 566, 622 N.Y.S.2d 560 (2d Dep't 1995)); see also Cirino v. City of New York (In re World Trade Ctr. Disaster Site Litig.), 754 F.3d 114, 126 (2d Cir. 2014)("The reasonableness of a fee award is a matter committed to the 'sound discretion' of the district court, and we review a district court's award of attorneys' fees under a highly deferential abuse of discretion standard."). In the case of a law firm's application for an award of fees for its service in a pending lawsuit, the Second Circuit has upheld the application of the federal lodestar analysis in awarding a quantum meruit recovery because "[it] is sufficiently congruent with the criteria applicable under New York Law." Sequa Corp., 156 F.3d at 148-49; Weg & Myers, P.C. v. 126 Mulberry St. Realty Corp., 453 F. App'x 90, 92 (2d Cir. 2011).

As for the criteria that govern a lodestar analysis, "[t]he starting point for an award of attorney's fees is the presumptively reasonable fee." <u>Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany</u>, 522 F.3d 182, 190 (2d Cir. 2008). "This initial estimate is calculated by multiplying 'the number of hours reasonably expended in the litigation . . . by a reasonable hourly rate.'" <u>Union Cent. Life Ins. Co. v. Berger</u>, 2013 WL 6571079, *3 (S.D.N.Y. Dec. 13, 2013)(quoting <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983)). <u>See also</u> <u>Briese Lichttechnik Vertriebs GmbH v. Langton</u>, 2011 WL 4756252, *1 (S.D.N.Y. Oct. 7, 2011) (quoting <u>Briese Lichttechnik Vertriebs GmbH v. Langton</u>, 2010 WL 3958737, *1 (S.D.N.Y. Oct. 4, 2010)).[3] The resulting figure, commonly referred to as the lodestar,[4] is not "conclusive in all circumstances," but

---

[3] The Supreme Court has articulated a description of what the goal of the analysis is, albeit in the context of a civil rights case: "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." <u>Perdue v. Kenny A. ex rel. Winn</u>, 559 U.S. 542, 552 (2010).

[4] The term "lodestar" has recently had a somewhat up-and-down fate in the Second Circuit. After years of usage of this term, the Second Circuit seemed to banish it in a series of <u>Arbor Hill</u> opinions, <u>see</u> <u>Arbor Hill</u>, 522 F.3d at 188-90, but it has since made a comeback after the Supreme Court utilized it in 2010 without questioning its appropriateness as a descriptor of the required fee analysis. <u>Perdue</u>, 559 U.S. at 552; <u>see also</u> <u>Millea v. Metron-N. R.R.Co.</u>, 658 F.3d 154, 166-69 (2d Cir. 2011); <u>Blessing v. Sirius XM Radio Inc.</u>, 2012 WL 6684572, *2 (2d Cir. Dec. 20, 2012); <u>Lucerne Textiles, Inc. v. H.C.T. Textiles Co., Ltd.</u>, 2013 WL 174226, *5 (S.D.N.Y. Jan 17, 2013).

"there is 'a strong presumption' that the lodestar figure is reasonable." <u>Perdue</u>, 559 U.S. at 552; <u>accord</u> <u>Millea</u>, 658 F.3d at 166.

Plaintiff obviously assumes that this presumption, in combination with the substance of his records, justifies the award that it seeks. As we will see, however, the circumstances we find in this case do not justify mechanically applying the presumption. Indeed, we conclude that any such presumption is unjustifed on the facts of record.

## 1. The Amount of Compensable Time

In determining how much attorney time should be compensated, the court initially looks to the amount of time spent on each category of tasks, as reflected in contemporaneous time records, <u>e.g.</u>, <u>Malletier v. Dooney & Bourke, Inc.</u>, 2007 WL 1284013, at *1 (S.D.N.Y. Apr. 24, 2007) (citing <u>New York Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1142-43, 1147 (2d Cir. 1983)). It then must determine how much of that time was "reasonably expended." <u>Id.</u> (internal quotations omitted). To do so "the court looks to its own familiarity with the case and . . . its experience generally as well as to the evidentiary submissions and

arguments of the parties." <u>Clarke v. Frank</u>, 960 F.2d 1146, 1153 (2d Cir. 1992) (internal quotations omitted).

This analysis takes into consideration overstaffing, the skill and experience of the attorneys, as well as redundant, excessive, or unnecessary hours. <u>Id.</u> Courts must consider both the "contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." <u>N.Y. State Ass'n for Retarded Children, Inc.</u>, 711 F.2d at 1148. Courts are to make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." <u>Lunday v. City of Albany</u>, 42 F.3d 131, 134 (2d Cir. 1994).

The burden is on the plaintiff "to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required." <u>F.H. Krear & Co. v. Nineten Named Trustees</u>, 810 F.2d 1250, 1265 (2d Cir. 1987). And courts may reduce awards when a plaintiff has not met this burden. <u>Id.</u>; <u>Monaghan v. SZS 33 Associations, L.P.</u>, 154 F.R.D. 78, 84 (S.D.N.Y. 1994)(citing <u>Hensley</u>, 461 U.S. at 433). In calculating reasonable hours, the essential consideration is whether a reasonable attorney would have expended similar hours in

pursuit of the case. Miroglio S.P.A. v. Conway Stores, Inc., 629 F. Supp. 2d 307, 312 (S.D.N.Y. 2009)(citing Grant v. Martinez, 973 F.2d 96, 99 (2d Cir.1992)).

If the court finds that some of the time spent was not reasonably necessary to the outcome, it should reduce the time for which compensation is awarded. See, e.g., Hensley, 461 U.S. at 433-37; Gierlinger v. Gleason, 160 F.3d 858, 876 (2d Cir. 1998). Such reductions are appropriate not only for work on unsuccessful claims and arguments, but also for inefficient or duplicative work. See Hensley, 424 U.S. at 434-35; In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir. 1987). "In reducing a claim for time spent, the court may 'use a percentage deduction "as a practical means of trimming fat from a fee application."'" Malletier, 2007 WL 1284013, *1 (quoting McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006)).

## 2. Determining the Presumptively Reasonable Rate

To determine an appropriate hourly rate, the court initially "looks to 'the prevailing market rates in the relevant community.'" Perdue, 559 U.S. at 551 (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984)). This traditional rule requires the court to determine the

rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." <u>Blum</u>, 465 U.S. at 895 n.11; <u>see</u> <u>also</u> <u>McDonald</u>, 450 F.3d at 96. Recently, the Second Circuit has suggested that the court should engage in a somewhat broader and more variegated analysis, under which it not only looks to the community-based measure of rates, but also takes into consideration a broader array of factors, first proposed by the Fifth Circuit in <u>Johnson v. Ga. Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974) <u>abrogated on other grounds by</u> <u>Blanchard v.</u> <u>Bergeron</u> 489 U.S. 87 (1989), in order to arrive at a presumptively reasonable fee. <u>See</u> <u>Arbor Hill</u>, 522 F.3d at 186.[5] According to <u>Arbor Hill</u>, the aim is to arrive at a rate that "a paying client would be willing to pay," with the court expected to "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." 522 F.3d at 190; <u>see</u>

---

[5] The court in <u>Johnson</u> invoked a series of twelve factors to inform a reasonable-fee determination, including: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. <u>See</u> <u>Arbor Hill</u>, 522 F.3d at 186 n.3 (citing <u>Johnson</u>, 488 F.2d at 717-19).

Simmons v. N.Y.C. Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009). "Johnson's 'list of 12' thus provides a useful catalog of the many factors to be considered in assessing the reasonableness of an award of attorney's fees. . . ." Blanchard, 489 U.S. at 93.


### 3. Adjustments to the Presumptive Fees


Once the presumptively reasonable fee is determined, courts then evaluate factors that may warrant an upward or downward adjustment of that fee. Union Cent. Life Ins., 2013 WL 6571079 at *3; see also Vernon v. Port Auth. of New York & New Jersey, 220 F. Supp. 2d 223, 229 (S.D.N.Y. 2002)(discussing circumstances that allow for an upward or downward adjustment of fees under Hensley). The factors to be considered include "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on these services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained." Sequa Corp., 156 F.3d at 148; see also Cirino, 754 F.3d at 126.


It also bears emphasis in the current context that federal courts have authority to supervise attorneys' fees through our "inherent authority to 'police the conduct of the attorneys as

officers of the court.'" <u>Cirino</u>, 754 F.3d at 125 (quoting <u>In re Goldstein</u>, 430 F.3d 106, 110 (2d Cir. 2005)). This authority permits us to "review a fee arrangement for reasonableness even if it has not been challenged by the parties." <u>Id.</u> at 126 (citing <u>Rosquist v. Soo Line R.R.</u>, 692 F.2d 1107, 1111 (7th Cir. 1982) ("Courts have a stake in attorney's fees contracts; the fairness of the terms reflects directly on the court and its bar.")).

Indeed, the courts' supervision of fees extends to fee reductions and even total disgorgement of legal fees already paid to discipline attorneys who have violated the standards or rules of professional conduct. <u>See</u>, <u>e.g.</u>, <u>In re Goldstein</u>, 430 F.3d 106, 110-12 (2d Cir. 2005)(upholding district court's reduction of fees and referral of attorney to the state discipline board for questionable management of client funds); <u>United States v. Small</u>, 2007 WL 2293028, *2 (E.D.N.Y. Aug. 7, 2007)(ordering disgorgement of all legal fees already paid to attorney who failed to effectively represent client and had appropriately been discharged by client prior to trial).

### 4. Caveats About the Use of the Lodestar Analysis Here

As is evident from the quoted caselaw, the lodestar approach is generally applied when a party seeks an award of fees for the work of its attorneys in a lawsuit conducted before the court that is to award fees. Perdue, 559 U.S. at 550-51; see also Sequa Corp., 156 F.3d at 148-49. Similarly, in some circumstances the quantum meruit assessment of legal services may occur in the context of a lawsuit during which the client terminated the attorney-client relationship without cause or the attorney ended it with cause. E.g., Sequa, 156 F.3d at 148. In both circumstances the court will have some familiarity with the performance of the attorney, the demands of the case and any complicating factors -- including the degree of success -- that may influence the measure of value, which is required in a quantum meruit analysis. In addition, the court is more likely in such circumstances to be familiar with hourly rates charged by attorneys of like stature in the community for work done in comparable litigation. See Farbotko v. Clinton Cnty. of New York, 433 F.3d 204, 209 (2d Cir. 2005) (holding that court can take judicial notice of prevailing rates for litigation services within its community).

In this case, by contrast, the bulk of plaintiff's claim is

15

for work done on non-litigation tasks -- indeed, work that appears to involve transactional services, potentially including the negotiation and drafting of contracts. Moreover, to the extent that plaintiff seeks compensation from CMA for litigation work, these services were performed in a lawsuit that was apparently undertaken and defended in a different court. In this context, then, the plaintiff's proof in justifying both the hourly rates and the amount of time claimed -- and, more generally, the value of its performance to defendants -- must be far more exacting than in the typical fee-application case. Additionally, that proof must reflect in some detail an evidentiary basis for applying the "reasonable time" and "reasonable rate" criteria from a lodestar analysis or an alternative form of proof of the value of the lawyer's services.

### C. What Plaintiff Seeks and Shows

#### 1. The Retainer Terms

Much of the factual background for plaintiff's quantum meruit application against CMA was set out in some detail in our prior decision denying summary judgment to plaintiff as against Mr. Eben. See Balestriere, 2014 WL 929813 at *7-9. The law firm entered into two retainer agreements with CMA, both dated June 4, 2010, each covering a different category of services. In one, the firm

16

undertook to represent the company in connection with a lawsuit that it described as involving the alleged failure of Wachovia Bank N.A. to transfer a letter of credit. (Balestriere Aff. ¶¶ 6-7; id. Ex. B). That agreement specified that if CMA recovered any money from Wachovia, the law firm would be entitled to a 50 percent share. Alternatively, it made allowance "for billing on an hourly basis at standard rates if the litigation became a matter where CMA was only a defendant." (Balestriere Aff. ¶ 7; id. Ex. B at 2, 3). In the second retainer contract, the Balestriere firm agreed to represent CMA in connection with a proposed, but unspecified, series of commodities transactions. The retainer agreement specified that the services contemplated encompassed "review[ing] documents related to the Transactions" and "answer[ing] any reasonable legal questions you pose regarding the Transactions" and "perform[ing] reasonable legal due diligence regarding any Transactions which the Firm deems necessary." (Balestriere Aff., Ex. C at 1). This agreement specified that plaintiff was to be remunerated "$1/metric ton of a given commodity for any commodities where the Firm provided services." (Balestriere Aff. ¶ 8; id. Ex. C at 2).[6] The agreement expressly excluded any litigation related

---

[6] The contract contained an exception for transactions involving concrete, for which the law firm would be paid $0.25 per metric ton. (Balestriere Aff., Ex. C, 2).

to such commodities transactions, and it recited that "[s]uch other services are subject to separate discussions and negotiation." (Balestriere Aff., Ex. C, 1; id. Ex. C at 2 (reciting that any other legal services would be subject to "our standard hourly rates.")).

The commodities agreement was later superceded by a revised retainer document, executed March 15, 2011. That successor agreement somewhat expanded the scope of the law firm's tasks to encompass not only review of transaction documents and related legal advice and due diligence, but also negotiation with non-parties, as well as advice and due diligence in connection with the "business dealings" of CMA. (Balestriere Aff., Ex. D, 1-2). This agreement retained, in modified form, the fee-payment terms under which the law firm was to be paid on a metric-ton basis from all commodities transactions on which it worked. (Id. at 2). Thus, the agreement established specific dollar amounts to be paid to the law firm per metric ton of sugar, scrap, iron ore and cooking oils, and provided that, for other commodities and "other services, including, but not limited to bank comfort letters and stand-by letters of credit," defendant and the firm "agree to negotiate in good faith for a fair fee for the Firm's services." (Id.). In addition, the agreement specified that "from any litigation or

dispute resolution" in which the law firm represented CMA, it would receive "50% of any recovery." (Id.). The law firm was entirely responsible for routine expenses, and the firm and the CMA defendants were to evenly split litigation-related expenses. The agreement also prohibited defendants from posting online any information that would disclose "the Firm's representation of [defendants], what the Firm is doing in your matter, or any other information of any kind whatsoever about or regarding the Firm." (Id. at 3).

## 2. The Documentation of Work and Fee Values

Plaintiff asks the court to award $638,559.51 against CMA. This figure reflects posited hourly fees for the time that various employees of the law firm spent on CMA work, together with out-pocket expenses, less $252,00.00 paid to the firm, plus interest at 9% from June 30, 2011. (Balestriere Aff. ¶¶ 12-13). The basis for this request appears to be plaintiff's representation that in the course of its legal and business dealings with defendants it provided services and made disbursements that, in total, should be valued at $766,842.79 (Natale Aff., Exs. 1-2), for

which the firm received $252,00.00 in offsetting payments.[7] Plaintiff's evidence in support of this claim includes daily summaries of personnel hours expended during the period from April 28, 2010 to June 30, 2011 (Natale Aff., Exs. 1-2), when the firm terminated its representation of CMA (Balestriere Aff., Ex. F), and a list of expenditures for the client's matters. (Natale Aff., Exs. 1-2).

Plaintiff's documentation of legal services for defendant CMA ecompasses two categories of work -- that involving the commodities transactions (Natale Aff., Ex. 1) and its participation in what is referred to as the Wachovia litigation. (Natale Aff., Ex. 2). For the commodities transactions, plaintiff documents hourly services valued at $680,153.50, plus disbursement expenses of $273.16 (Natale Aff., Ex. 1, 55-56), for a total of $680,426.66. For the Wachovia matter, plaintiff documents hourly services valued at $85,704.80 plus disbursement expenses of $711.33. (Natale Aff., Ex. 2, 22-23), for a total of $86,416.13.

In its introduction to the logs of personnel hours, plaintiff

---

[7] We note that $250,000.00 of this amount was acquired by the firm through its invasion of an escrow account, holding funds transmitted to it by the investors who were allegedly defrauded by CMA and Eben. Balestriere, 2014 WL 929813 at *9.

explains that staff time related to defendants' matters were recorded daily and reviewed daily by an individual titled the "chief of staff." (Natale Aff. ¶¶ 3-8). Monthly invoices were then generated from the daily records and reviewed by partners for accuracy. (Id. at ¶¶ 9-12). Plaintiff lists hours and rates for seven categories of individuals, titled variously "partner," "counsel," "attorney," "legal analyst," "legal apprentice," "apprentice," and "chief of staff." However, plaintiff provides no explanation of the backgrounds and qualifications of the listed individuals, other than Mr. Balestriere, nor is there any explanation of the job descriptions or responsibilities tied to the different staff positions listed in the accounting of time. Plaintiff documents rate increases during the period of representation for one of the lawyers and one of the legal analysts.[8] (Natale Aff., Ex. 1, 56; id. Ex. 2, 24). No explanation was provided for why these rates changed during the period of representation.

Finally, we noted in our findings of March 7, 2014, and plaintiff admits in its inquest submissions, that plaintiff

---

[8] Partner John Balestriere logged 105 hours at $730 per hour and 664.9 hours at $755 per hour. Legal Analyst SaraAnn C. Bennet logged 4.8 hours at $225 per hour and 1.7 hours at $240 per hour. (Natale Aff. Ex. 1, 56, Ex. 2, 24)

appropriated from the escrow account it held for the investors $250,000.00 in compensation for fees it claimed to be owed it by defendant CMA. <u>Balestriere</u>, 2014 WL 929813 at *14; (Balestriere Aff. ¶ 34). Plaintiff's inquest submissions thus acknowledge that whatever damages are due for uncompensated services must be reduced by the $252,000.00 previously collected from CMA and from the investors' funds on account of CMA. (Balestriere Aff. ¶¶ 13, 34-37).[9]

### D.   Assessment of the Commodities Work & Fees

In plaintiff's accounting for time expended on work related to commodities transactions, it documents the following:

1.   776.6 hours spent by five attorneys at hourly rates from $255.00 to $755.00 per hour, for a total of $580,576.00,[10]

---

[9] Plaintiff's submission is inconsistent on the total amount of payments previously received from defendants. Plaintiff acknowledges a $2,000.00 payment made in the summer of 2010 and a $250,000.00 payment made in May of 2011 (Balestriere Aff. ¶ 13); however, later in the same document it refers to the $250,000.00 amount taken from escrow without mention of the $2,000.00 payment in the summer of 2010. (<u>Id.</u> at ¶¶ 34-37). For the purposes of this inquest, there is no need to distinguish between the sources of the payments previously received.

[10] The lawyers listed are Angie Jean Chrysler, identified as "counsel"; Brandon J. Page, referred to as an attorney; Geisa

2.    444.5 hours from six individuals labeled as "legal analysts," at rates from $210.00 to $240.00, for a total of $93,507.00,[11]

3.    4.1 hours from Mark J. Natale, who is described as the "chief of staff," at a rate of $275.00 per hour, for a total of $1,127.50,

4.    2.1 hours by a "legal apprentice," at a rate of $255.00 per hour, for a total of $535.50,[12] and

5.    21.5 hours from an "apprentice," at a rate of $205.00 per hour for a total of $4,407.50.[13]

(Natale Aff., Ex. 1, 56). The hours listed are summations from the daily hours logged for each staff member. (Natale Aff., Ex. 1; see also Table 1, infra).

To make the initial determination of a presumptively

---

Balla, also listed as an attorney; John Balestriere, the "partner"; and Stefan Savic, referred to as an attorney. Mr. Balestriere accounts for 669.9 hours of work at fees of either $730.00 or $755.00 per hour. (Natale Aff., Ex. 1, 56).

[11] These individuals are identified as Adam B. Goodrum, Jessica Acosta, Laura C. Sayler, Nicole Taykhman, SaraAnn C. Bennett, and Sarah R. Goodman.

[12] The "legal apprentice" is named Adam Antreassian.

[13] The "apprentice" is named Cody B. Curran.

reasonable fee, we must determine both the reasonable rate for the services provided and the number of hours reasonably expended on those services. We consider each of these matters in turn.

### 1. Reasonable Rates for Plaintiff's Personnel

The Second Circuit bases the reasonable rate for an attorney on "'the [current] prevailing market rate for lawyers in the district in which the ruling court sits.'" US Foods, Inc. v. 587 Rest. Corp., 2014 WL 1054661, n.3 (S.D.N.Y. Mar. 13, 2014)(quoting Anthony v. Franklin First Financial, Ltd., 844 F. Supp.2d 504, 507 (S.D.N.Y.2012)); see, e.g., Farbotko, 433 F.3d at 209; Polk v. New York State Dep't of Corr. Servs., 722 F.2d 23, 25 (2d Cir. 1983). Moreover, the plaintiff bears the burden of providing "satisfactory evidence -- in addition to the attorney's own affidavits" that its rates are the market rates. Farbotko, 433 F.3d at 209. When attorneys have failed to provide background information for the personnel for whom they seek fees, a court may award fees at the low end of the market rate. Flores v. J & B Club House Tavern, Inc., 2012 WL 4891888, *5 (S.D.N.Y. Oct. 16, 2012)(citing Tlacoapa v. Carregal, 386 F. Supp. 2d 362, 370 (S.D.N.Y. 2005)).

Plaintiff's showing to justify the hourly rates that it seeks

is entirely inadequate. As noted, it seeks to validate fees between $255.00 and $755.00 for lawyers, and $205.00 to $255.00 for other employees, titled variously as "legal analyst," "legal apprentice," "apprentice," or "chief of staff." With the exception of John Balestriere, Esq. -- the apparently controlling partner of the law firm, who is identified as a Yale Law School graduate with fifteen years of legal experience (Balestriere Aff. ¶ 27) -- plaintiff provides no information as to the background or experience of any of the employees listed. Even as to Mr. Balestriere, the plaintiff fails to indicate whether he had any experience in advising clients about commodities transactions or drafting such contracts, and if so, the nature of that experience. Plaintiff also fails entirely to identify what the non-lawyer titles are intended to signify in terms of the responsibilities of the individuals as well as their education, training, and skills.

Plaintiff equally fails to proffer any evidence as to the fees typically charged by small law firms in the community for comparable work by comparably experienced lawyers and non-lawyers. Indeed, it does not address in any specifics what their work involved. Moreover, the time records are generally unhelpful in describing what was being done. Thus, for the majority of hours spent by an identifiable lawyer -- Mr. Balestriere -- they

repetitively refer to "[t]ransaction deals and communications with client and staff, client including legal analysis and review." Staff entries are still less illuminating. Indeed, the only guidance -- which is entirely speculative -- is from the contractual terms, which refer to the law firm agreeing to review documents, answer client questions, do some form of limited due diligence, and (in the revised agreement) to conduct negotiations.

In the absence of relevant information about comparable rates in the community, we conclude that hourly rates for the law firm should be on the bottom end of whatever spectrum might be available. In this regard, we note that the law firm is small, with a likely lower overhead, see Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1058-59 (2d Cir. 1989)(noting that small firms in this district have different, lower rates than large firms because larger firms have higher overhead incorporated into their fees); only one lawyer seems to have been substantially involved in whatever work was done, and his qualifications and skills for the this work are entirely murky; the client was (to put it charitably) a very marginal figure who was unlikely to be represented by more substantial and higher-charging law firms in this district; and the work involved was -- to use the vernacular -- seemingly quite "sketchy," involving mainly the extraction of

funds from the allegedly victimized investors. We also note in this respect that the conduct of plaintiff -- both in facilitating a fraud (even if arguably unknowingly) and then quite knowingly paying itself from the investors' escrowed funds -- reflects, at the least, ethically challenged conduct of its affairs. This too counsels in favor of minimal rates to be used in assessing the benefit of its services. Finally, as for the quality of plaintiff's performance, our only guidance is the law firm's performance as found in the venue in which it litigated the current lawsuit, and that performance left much to be desired, as reflected in our 2013 denial of judgment against CMA and our 2014 denial of summary judgment against Eben.

In view of the absence of evidence as to the prevailing rates for the type of commercial work undertaken by plaintiff, the qualifications of the various individuals investing time in the project, and the work actually done, we are left to take notice of prior fee awards, granted -- admittedly -- for litigation services, not commercial endeavors of the specialized nature asserted at issue here. Recent awards in the Southern District of New York for civil attorneys in small firms litigating straightforward issues reflect hourly rates in the range of $200.00 to $400.00, and $50.00 to $150.00 for paralegals. See, e.g., Matteo v. Kohl's Dep't

Stores, Inc., 2012 WL 5177491, *3-4 (S.D.N.Y. Oct. 19, 2012)(discussing cases), aff'd, 533 F. App'x 1 (2d Cir. 2013); Flores v. J & B Club House Tavern, Inc., 2012 WL 4891888,*4-5 (S.D.N.Y. Oct. 16, 2012)(both cases citing recent fee awards in this district); accord Lane Crawford LLC v. Kelex Trading (CA) Inc., 2013 WL 6481354, *7 (S.D.N.Y. Dec. 3, 2013)(noting partners in small firm with 15 years experience litigating intellectual property cases billed at $350.00); Romeo & Juliette Laser Hair Removal, Inc. v. Assara I, LLC, 2013 WL 3322249, *5 (S.D.N.Y. July 2, 2013)(25-year associate billed at $300.00, second-year law student/intern billed at $75.00). The courts factor in the size of a firm in determining the market rate, noting that smaller firms have, among other distinctions, far lower overhead costs than large firms. Tlacoapa, 386 F. Supp. 2d at 370. Courts in this district have justified hourly fees above $400.00 when "the litigation was extremely complex, the lawyer very experienced, and the firm . . . was one of 'the largest and most well-regarded firms in the world.'" Matteo, 2012 WL 5177491 at *4 (quoting E.S. v. Katonah-Lewisboro School District, 796 F.Supp.2d 421, 429-30 (S.D.N.Y. 2011). See also Spencer v. City of New York, 2013 WL 6008240, at *5 (S.D.N.Y. Nov. 13, 2013)(awarding fees of $400.00 to experienced counsel after surveying recent fee awards where counsel with over 15 years of experience -- and most with over 30 years of

experience -- received awards above $400.00).

As noted, we lack information as to the background of all but one timekeeper and have no information about the commercial experience of any of the law firm employees for whose time plaintiff seeks compensation. We also have no information about prevailing rates for this area of work and are generally unimpressed with the quality of legal work from the individuals whom we have seen in this case. Accordingly, we determine that firm partner John Balestriere will be compensated at the hourly rate of $350.00 and other attorneys at the rate of $200.00. As for the non-lawyers, we have no meaningful information from plaintiff as to whether some or all or any had paralegal training or any law school experience. Trained paralegals and law students are typically granted comparable rates, and these seem to be as low as $75.00.[14] See Flores, 2012 WL 4891888 at *5 (recognizing non-attorney fees in this district between $50.00 and $150.00 and reducing a rate for a non-attorney to $50.00 because the fee petition lacked background

_____

[14] The Second Circuit does allow fees to be awarded at market rates for paralegal services. U.S. Football League v. Nat'l Football League, 887 F.2d 408, 416 (2d Cir. 1989). And our courts have also allowed hourly fees for law school interns, legal assistants, and clerks. See, e.g., Malletier, 687 F. Supp. 2d at 362; Moon v. Gab Kwon, 2002 WL 31512816, *3 (S.D.N.Y. Nov. 8, 2002).

information on the non-attorneys). Absent any indication of qualifications, we infer that these individuals lack paralegal training or law school experience and therefore set their rate at $50.00.

## 2. Reasonable Hours for Plaintiff's Personnel

Plaintiff seeks compensation for nearly 1,250 hours of work by firm personnel relating to commodities transactions of CMA. Of this amount, almost all is attributable to Mr. Balestriere, the only identified partner, and to Jessica Acosta, identified as a "Legal Analyst." Balestriere claims the lion's share of this total, listing 769.9 hours, and Ms. Acosta trails with 417.6 hours. We conclude that these totals are not remotely justified by any evidence concerning what these individuals actually did that involved the facilitating of commodities transactions, and that plaintiff also manifestly fails to suggest that any benefit that plaintiff provided to CMA merits compensation premised on this gargantuan amount of time.

The core of plaintiff's case against Eben and CMA -- particularly as grounding for its fraud claim -- is that, contrary to Eben's representations, CMA had not carried out any transactions

for a number of years before plaintiff agreed to represent it, and
that in fact it was not in a financial position to do so. Indeed,
plaintiff has pursued the assertion that these defendants were
seeking to use the law firm as protective cover for an effort to
steal money from unsuspecting outside investors by giving CMA the
patina of a functioning business. Balestriere, 2014 WL 929813 at
*1. (See also Mem. of Law in Support of Balestriere Parties' Mot.
for Summary Judgment Against G. Eben, 11-cv-9459, Doc. 165, July
19, 2013, 11-15). We further note that there is no indication in
the record that, during the period of the law firm's asserted
activities on behalf of CMA, any such transactions were ever
consummated. Additionally, under the terms of plaintiff's retainer
agreement with CMA concerning commodities transactions, the scope
of the firm's responsibilities was sharply limited, to providing
legal advice, reviewing and possibly drafting transactional
documents, and -- in the revised agreement -- negotiation of
transactions. (Balestriere Aff., Ex. C, 1; id. Ex. D, 1-2).

      With these circumstances in mind, we look to the time records,
but they provide little information as to what the fee-generating
actors were doing that might benefit CMA. The entries of Mr.
Balestiere are illustrative. The vast majority of his entries are
worded as follows (with minor emendations):

Transaction deals and communications with client and staff, including legal analysis and review.

Emails to and from client and phone communications re: agreements and deals, including general counseling and contracts.

General counseling and contract works, often including emails and calls.

(Natale Aff. Ex. 1). Ms. Acosta's entries are similarly unenlightening, since they refer largely to what appear to be fairly ministerial functions, with no reference to the context in which she was performing listed tasks. (Id.).[15] In addition, we note that the pattern of Mr. Balestriere's entries are at least suspect -- although the wording occasionally varies slightly, he lists a long array of more or less identical entries each working day, and each entry cites the same amount of time, day after day.[16] While

---

[15] We note in this regard that the time records make cryptic references to some sort of proceedings involving Wells Fargo and J.P. Morgan. (Natale Aff. Ex. 1, 14-20, entries for JDA covering dates in Nov. to Dec. 2010). What relationship these items have to commodities transactions by CMA (whether past or contemplated) is left entirely unexplained by plaintiff.

[16] Most notably, Mr. Balestriere repeatedly invokes the formulation "Transaction deals and communications with client . . ." and then links it to a claim of 1.9 hours (except as noted), on the following dates: June 25 & 30; July 1, 2, 5-7, 12-16, 19-23, 27-30; August 2-4, 6, 10-13, 16-20, 23, 25, 27, 30-31; September 1-3, 6, 9-14; November 9-12, 15-19, 22-23, 26, 29; December 1, 6, 8-9, 16-17, 20-22, 28-29; January 4-7, 10-14, 17-21, 24-27, 28 (listing 2.1 hours), 31; February 1-2 (2.1 hours), 3, 4 (2.1 hours), 7-8 (2.1 hours), 9-11 (2.1 hours), 14-15 (2.1 hours), 18 (2.1 hours), 22-25 (2.1 hours); March 1, 9 (2.1 hours), 10 (3.1 hours), 15 (3.1 hours), 16 (1.9 & 2.1 hours), 17

this pattern might capture simply an extraordinarily inflexible schedule of work, it is entirely unexplained and could well reflect the mechanical listing of the same entry and time, week after week, irrespective of what work was in fact being done. That mystery could have been explained by plaintiff as part of a showing of what firm personnel actually accomplished through the long periods of representation and huge purported investment of time. But, as noted, plaintiff has offered no scintilla of evidence to justify either the amount or the claimed pattern of listed time segments.

---

(3.1 hours), 18 (3.9 hours), 21-22 (2.1 hours), 23 (1.1 hours), 24, 25 (2.9 hours), 28-31 (2.1 hours). Starting in April 2011, the pattern changed, although the entries used the same formulation. Almost without fail, Balestriere booked five hours each weekday and one hour each weekend day. Thus we note the following dates and times: April 1 (5 hours), 2-3 (1 hour each), 4-8 (5 hours each), 9-10 (1 hour each), 12-15 (5 hours each except one listing of 6.1 hours), 16-17 (1 hour each), 18-22 (5 hours each), 23-24 (1 hour each), 25-29 (5 hours each except one listing each of 6.1 and 6.9 hours), 30 & May 1 (1 hour each), 2-6 (5 hours each), 7-8 (1 hour each), 9-13 (5 hours each), 14-15 (1 hour each), 16-18 (5 hours each), 20 (5.1 hours), 21-22 (1 hour each), 23-27 (5 hours each), 28-29 (1 hour each), 30-31 & June 1-3 (5 hours each except one listing of 7.1 hours), 4-5 (1 hour each), 6-10 (5 hours each), 11-12 (1 hour each), 13-17 (5 hours each), 18-19 (1 hour each), 20-24 (7 hours). On June 25, 2011, he lists nine hours under the same heading and thereafter, until the end of the attorney-client relationship on June 30 he lists 9 hours each day (June 25-28). The listing concludes with on June 29 with 2.1 hours (for transactions) and 10 hours for "investigation into misconduct" by the client -- and an identical 10 hours the next day for the same "investigation into misconduct."

Plaintiff's estimation of benefits conferred on defendants suffers from two other, if related, impediments. First, if, as may be the case, the principal benefit that the law firm afforded defendants was in the form of the defrauded investors' provision of funds to defendants via the law firm -- a transaction that plaintiff concedes, indeed even contends, was fraudulent -- there is an open question as to whether, as a matter of public policy, the firm should be awarded compensation for those efforts. In any event, the time records are entirely opaque with regard to what time was spent in dealing with the investors or their representative.

Second, as our summary of the pertinent retainer agreements suggests, the relationship between CMA and the law firm amounted to a joint venture in the guise of an attorney-client relationship. This is reflected in the fee arrangement under which, for services linked to the commodities transactions but excluding related litigation, plaintiff was to received specified payments tied to the execution of contemplated transactions and based specifically on the weight of various shipped commodities, and it is further reinforced by the provision that the law firm would share certain expenses with the client and would also share equally any awards in litigation. (Natale Aff., Ex. C, 2; id. Ex. D, 2-3). Putting to one

34

side the question of whether any of the contractual terms might strain or even violate applicable ethical standards,[17] this business arrangement adds a further cautionary note in assessing the extent of benefits conferred by plaintiff on CMA. To the extent that the

_____

[17] It is a well-established tenet of the professional codes of conduct that it is ethically suspect and generally unwise for attorneys to engage in business relationships with clients. See, e.g., N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.23(a), Rule 1.8(a)[corresponding to N.Y. Code of Prof'l Responsibility DR 5-104(A)(restricting business transactions between attorneys and current clients because of potential conflicts of interest); ABA Model Rules of Professional Conduct, Rule 1.8 (a)(available at http://www.americanbar.org/groups/professional_responsibility/pub lications/model_rules_of_professional_conduct/rule_1_8_current_cl ients_specific_rules.html, hereinafter "ABA Model Rules"); see also Sun Forest Corp. v. Shvili, 152 F. Supp. 2d 367, 394-95 (S.D.N.Y. 2001)("New York courts cast a wary eye on business contracts between attorneys and their clients."). This conflict-of-interest caution is particularly appropriate when the subject of the legal representation overlaps with the business transactions between attorney and client. See N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.23(i), ABA Model Rules 1.8(i)(forbidding lawyers from gaining a proprietary interest in the cause of action or subject matter of litigation).

Courts scrutinize transactions between an attorney and a current client carefully because there is a presumption that the attorney will have advantages through his superior knowledge of transactions and by virtue of the inherent trust a client invests in her attorney. ABA Model Rules, Rule 1.8, Comment 1; Sun Forest Corp., 152 F. Supp. 2d at 394. Safeguards requiring independent counsel for the client and extensive disclosures by the attorney put the burden on the attorney to ensure the fairness of the relationship, and generally these safeguards serve to demonstrate the strictness of the rule against business relationships between attorneys and current clients. Sun Forest Corp., 152 F. Supp. 2d at 395 ("'Even in the absence of [fraud or undue influence] the agreement may be invalid if it appears that the attorney got the better of the bargain. . . .'"(quoting Greene v. Greene, 56 N.Y.2d 86, 92, 451 N.Y.S.2d 46, 48 (1982)).

law firm was actually working on specific transactions -- an assumption that we make despite the silence of the record on that question -- the law firm itself was a beneficiary (as was CMA) since the firm stood to profit from any closed transactions. Simply assuming, as the plaintiff's application does, that defendants alone were to be the beneficiaries of those efforts ignores the substance of the relationship. In short, that consideration as well suggests caution in valuing the benefit received by CMA from the firm's investment of time on these transactions.[18]

To determine compensable hours for plaintiff's representation in the commodities transactions, we also consider the factors laid out in Arbor Hills/Johnson: the time and level of skill required, the novelty of the matter, the preclusion of other legal work due to the representation, the results obtained, the reputation of the lawyers, the nature of the client relationship, and awards offered in similar cases. 522 F.3d at 186 n.3; see also Sequa Corp., 156 F.3d at 148 (a court must consider "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably

---

[18] We also note that some of the time entries listed by plaintiff were manifestly not in the interest of the client; most notably the 20 hours claimed by Mr. Balestriere for investigating the client's asserted "misconduct," an activity that was plainly for the exclusive benefit of the law firm.

expended on these services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained"); Cirino, 754 F.3d at 126.

Given the state of the record, plaintiff fails to meet its burden to show that any of these considerations militate in favor of the award that it seeks. In view of the minimal showing by plaintiff on all relevant factors, we make an across-the-board cut of 70% from total hours billed by the attorneys and non-lawyers listed in plaintiff's proffer. This results in 374.64 hours, for a total fee of $88,324.50.[19] See Table 1, infra. We separately grant plaintiff the requested $273.16 in disbursements and expenses related to the commodities representation.

---

[19] Substantial reductions of this nature are not unusual in appropriate cases. See, e.g., Romeo & Juliette Laser Hair Removal, Inc., 2013 WL 3322249 at *5-8; Days Inn Worldwide, Inc. v. Amar Hotels, Inc., 2008 WL 2485407, *10 (S.D.N.Y. June 18, 2008), and this is certainly such a case.

Table 1: Commodities Transactions

**Commodities Transactions**

| | Position | Original Hours | Original Rate | Original Fees | Reduced by | Reasonable Hours | Reasonable Rate | Reasonable Fees |
|---|---|---|---|---|---|---|---|---|
| AA | Apprentice | 2.1 | 255 | $535.50 | 70% | 0.63 | 50 | $31.50 |
| ABG | Paralegal | 9.9 | 210 | $2,079.00 | 70% | 2.97 | 50 | $148.50 |
| AJC | Attorney | 0.8 | 280 | $224.00 | 70% | 0.24 | 200 | $48.00 |
| BJP | Attorney | 1.4 | 310 | $434.00 | 70% | 0.42 | 200 | $84.00 |
| CBC | Apprentice | 21.5 | 205 | $4,407.50 | 70% | 6.45 | 50 | $322.50 |
| GB | Attorney | 2.2 | 310 | $682.00 | 70% | 0.66 | 200 | $132.00 |
| JA | Paralegal | 417.6 | 210 | $87,696.00 | 70% | 125.28 | 50 | $6,264.00 |
| JB1 | Attorney | 105 | 730 | $76,650.00 | 70% | 31.5 | 350 | $11,025.00 |
| JB2 | Attorney | 664.9 | 755 | $501,999.50 | 70% | 199.47 | 350 | $69,814.50 |
| LCS | Paralegal | 0.8 | 240 | $192.00 | 70% | 0.24 | 50 | $12.00 |
| MJN | Chief | 4.1 | 275 | $1,127.50 | 70% | 1.23 | 50 | $61.50 |
| NT | Paralegal | 9.2 | 210 | $1,932.00 | 70% | 2.76 | 50 | $138.00 |
| SCB1 | Paralegal | 1.7 | 240 | $408.00 | 70% | 0.51 | 50 | $25.50 |
| SCB2 | Paralegal | 4.8 | 225 | $1,080.00 | 70% | 1.44 | 50 | $72.00 |
| SRG | Paralegal | 0.5 | 240 | $120.00 | 70% | 0.15 | 50 | $7.50 |
| SS | Attorney | 2.3 | 255 | $586.50 | 70% | 0.69 | 200 | $138.00 |
| | | | | | | | | |
| TOTALS | | 1248.8 | | $680,153.50 | | 374.64 | | $88,324.50 |

## E.   Assessment of Fees for the Wachovia Matter

In plaintiff's accounting for time expended on the Wachovia case, it documents staff hours totaling $85,704.80, itemized as follows:

1.   74.1 hours spent by four attorneys at rates from $225.00 to $755.00 per hour, for a total of $25,762.50,[20]

2.   232.7 hours spent by five individuals labeled as "legal

---

[20] The four lawyers and the titles that plaintiff bestows on them are: Angie Jean Chrysler, counselor, Geisa Balla, attorney, John Balestriere, partner, and Stefan Savic, attorney.

analysts," at rates from $210.00 to $240.00, for a total
of $48,987.00,[21]

3.    9 hours from three "apprentices," at rates from $195.00
to $205.00, for a total of $10,155.80,[22]

4.    32.06 hours from a "legal apprentice," at a rate of
$255.00, for a total of $8,175.30,[23] and

5.    4.1 hours from an individual with no position or title,
listed at a rate of $195.00 per hour, for a total of
$799.50.[24]

(Natale Aff., Ex. 2, 23-24; see also Table 2, infra). As in
plaintiff's application for an award for its work on the
commodities transactions, plaintiff offers no evidence as to the
experience and qualifications of the personnel listed in order to
justify the rates provided. Equally significantly, plaintiff offers
no evidence concerning the nature of the litigation -- including

---

[21] The "legal analysts" are: Adam B. Goodrum, Jessica Acosta,
Laura C. Sayler, Nicole Taykhman, and SaraAnn C. Bennett.

[22] The "apprentices" are: Cody B. Curran, Erin Jaeger, and
Jennifer Zhao.

[23] The "legal apprentice" is Adam Antreassian.

[24] The untitled person is Adil A. Khan. We note that the work
for which this individual billed involved drafting
interrogatories and requests to produce. (Natale Aff. Ex. 2, 13-
14).

its location[25] or the claims involved[26] -- much less the course of the proceeding, the outcome, or the extent of the plaintiff's involvement in representing CMA.

Despite the vacuum of relevant information, we are obliged to make some estimate of the value of plaintiff's performance. To this end, we briefly address both rates and hours.

### 1. Reasonable Rates for Plaintiff's Personnel

As with plaintiff's work on commodities transactions, here too we take judicial notice of recent fee awards in this district and place plaintiff's personnel on the low end of the spectrum because there is no evidence to support a rate higher than that. Moreover, we lack any direct knowledge of the particulars of the Wachovia litigation and have no basis to consider the legal work in that

---

[25] This item is significant for a lodestar analysis because prevailing rates are to be determined from practices of the legal community in the district where the proceeding was conducted. Perdue, 559 U.S. at 551.

[26] This too can be significant, since specialized litigation may justify higher fees. See In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 232 (2d Cir. 1987)(indicating that courts in the this circuit may recognize special circumstances or litigation requiring special expertise that would justify a higher rate than that of the local market).

matter to warrant a higher fee.

We determine that in the Wachovia litigation, firm partner John Balestriere will be compensated at the hourly rate of $350.00, other attorneys at the rate of $200.00, and non-lawyers at the rate of $50.00.

### 2.   Reasonable Hours for the Wachovia Litigation

The Wachovia matter involved a potential contingency or "success fee" basis for plaintiff to be compensated for legal services. (Balestriere Aff., Ex. B, 2). The contingency fee was 50% of the recovery -- that is, cash or "anything of value, or any other service or thing of value of any kind from any source" if plaintiff law firm "had any contact of any kind with the source" of the recovery prior to that recovery. Id.[27] Our circuit and New York courts recognize that a discharged attorney who had been employed through a contingency agreement may receive a quantum meruit award for services already performed. See In re McCrory Stores Corp., 91 F.2d 947, 949 (2d Cir. 1937).

_____

[27] As noted, if no recovery was obtained, fees were to be charged based on the law firm's standard hourly rate. (Balestriere Aff., Ex. B, 2-3).

We have reviewed the time records that plaintiff proffers to document the hours spent on litigating the Wachovia matter, but do so without knowing the scope, nature, or outcome of that matter. Nonetheless, we find that, with some exceptions, the work descriptions conform to reasonable expectations for what we assume was a commercial litigation. Plaintiff describes drafting and editing pleadings, information subpoenas, discovery requests and responses, and motion papers. (Natale Aff., Ex. 2). Although some entries seem, on their face, excessive -- such as time charged for simple administrative tasks (e.g., id. at 9-11 (4.8 hours to review local court rules, learn how to file with the court, and complete a pro hac vice application)), the work described is plainly legal work and adequately explained.

While plaintiff's proffers regarding the Wachovia litigation sufficiently address the work done, they still suffer from some of the same limitations as those for the commodities transactions. Most significantly, there is no description regarding the nature or complexity of the litigation, its procedural requirements, and the success of the representation.

After weighing all the factors pertinent to assessing reasonable hours, we determine that the most reasonable course of

42

action is to make an across-the-board cut of 10% from total hours
billed by the attorneys and non-lawyers listed in plaintiff's
proffer. This results in 317.57 compensable hours, for a total fee
of $24,923.70. <u>See</u> Table 2, <u>infra</u>. We also grant plaintiff the
requested $711.33 in disbursements and expenses related to the
litigation.

Table 2: Wachovia Litigation

**Wachovia Litigation**

| | Position | Original Hours | Original Rate | Original Fee | Reduced by | Revised Hours | Revised Rate | Revised Fees |
|---|---|---|---|---|---|---|---|---|
| AA | Apprentice | 32.06 | 255 | $8,175.30 | 10% | 28.854 | 50 | $1,442.70 |
| AAK | | 4.1 | 195 | $799.50 | 10% | 3.69 | 50 | $184.50 |
| ABG | Paralegal | 2.1 | 210 | $441.00 | 10% | 1.89 | 50 | $94.50 |
| AJC | Attorney | 23.9 | 280 | $6,692.00 | 10% | 21.51 | 200 | $4,302.00 |
| CBC | Apprentice | 5 | 205 | $1,025.00 | 10% | 4.5 | 50 | $225.00 |
| EJ | Apprentice | 2.4 | 195 | $468.00 | 10% | 2.16 | 50 | $108.00 |
| GB | Attorney | 19.7 | 310 | $6,107.00 | 10% | 17.73 | 200 | $3,546.00 |
| JA | Paralegal | 210.2 | 210 | $44,142.00 | 10% | 189.18 | 50 | $9,459.00 |
| JB1 | Attorney | 7.7 | 755 | $5,813.50 | 10% | 6.93 | 350 | $2,425.50 |
| JB2 | Attorney | 4 | 730 | $2,920.00 | 10% | 3.6 | 350 | $1,260.00 |
| JZ | Apprentice | 2.5 | 195 | $487.50 | 10% | 2.25 | 50 | $112.50 |
| LCS | Paralegal | 0.3 | 240 | $72.00 | 10% | 0.27 | 50 | $13.50 |
| NT | Paralegal | 13.6 | 210 | $2,856.00 | 10% | 12.24 | 50 | $612.00 |
| SCB1 | Paralegal | 5.6 | 225 | $1,260.00 | 10% | 5.04 | 50 | $252.00 |
| SCB2 | Paralegal | 0.9 | 240 | $216.00 | 10% | 0.81 | 50 | $40.50 |
| SS | Attorney | 18.8 | 225 | $4,230.00 | 10% | 16.92 | 50 | $846.00 |
| TOTALS | | 352.86 | | $85,704.80 | | 317.57 | | $24,923.70 |

**F.    Prejudgment Interest**

Plaintiff also seeks prejudgment interest on the <u>quantum meruit</u> award against CMA at the rate of nine percent per annum, dating from June 30, 2011, when the law firm withdrew from representation, until the entry of judgment. (Balestriere Aff. ¶ 21).

Because this is a diversity case (Balestriere Aff., Ex. A, ¶ 4), New York law governs the court's determination of prejudgment interest. <u>Schwimmer v. Allstate Ins. Co.</u>, 176 F.3d 648 (2d Cir. 1999)("The awarding of prejudgment interest is considered a question of substantive law."). New York law sets the rate for prejudgment interest at nine percent per annum. N.Y.C.P.L.R. §§ 5001, 5004 (McKinney).

New York law leaves to the court's discretion whether to award prejudgment interest on claims arising in equity. N.Y.C.P.L.R. § 5001(a). However, New York courts and the courts of this circuit are in accord that for purposes of prejudgment interest, <u>quantum meruit</u> recovery is more akin to an action in law than to one in equity. <u>Stillman v. InService American Inc.</u>, 738 F. Supp. 2d 480, 481-82 (S.D.N.Y. 2010)(citing <u>Ash & Miller v. Freedman</u>, 114 A.D.2d

823, 495 N.Y.S.2d 183 (1st Dep't 1985); <u>Tesser v. Allboro Equip.
Co.</u>, 73 A.D.3d 1023, 904 N.Y.S.2d 701 (2d Dep't 2010); <u>Brent v.
Keesler</u>, 32 A.D.2d 804, 805, 302 N.Y.S.2d 349 (2d Dep't 1969)); <u>see
also</u> <u>Aniero Concrete Co.</u>, 308 F. Supp. 2d at 211. Therefore, we
apply the statutory nine-percent rate.

"[P]rejudgment interest must be calculated on a simple
interest basis at the statutory rate of nine percent." <u>Marfia v.
T.C. Ziraat Bankasi</u>, 147 F.3d 83, 90 (2d Cir. 1998) <u>mod. other
grounds by</u> <u>Baron v. Port Auth. of New York & New Jersey</u>, 271 F.3d
81 (2d Cir. 2001). Interest starts accruing "from the earliest
ascertainable date the cause of action existed" until a judgment is
rendered. N.Y.C.P.L.R. § 5001(b).

We grant plaintiff's request for prejudgment interest on the
commodities transactions and Wachovia litigation awards at the rate
of nine per cent per annum, in simple interest, beginning July 1,
2011 when plaintiff no longer represented defendants in any legal
matters. As of December 31, 2014, plaintiff is due three years plus
six month interest on the <u>quantum</u> <u>meruit</u> awards. Interest comes to
$27,908.26 on the commodities-transactions award and $8,075.03 on
the Wachovia-litigation award. <u>See</u> Table 3 <u>infra</u> for calculations.

Table 3: Interest and Total Awards on Quantum Meruit

| | Commodities | Wachovia |
|---|---|---|
| Award | $88,324.50 | $24,923.70 |
| Fees | $273.16 | $711.33 |
| Total | $88,597.66 | $25,635.03 |
| Int. Rate | 9.00% | 9.00% |
| Years | 3.5 | 3.5 |
| Interest | $27,908.26 | $8,075.03 |
| | | |
| Total Award | $116,505.92 | $33,710.06 |

## II.  Spoliation Motion Fees

Plaintiff requests that the court award it attorney's fees in the amount of $10,260.00 as the reasonable expense of its sanction motion against Mr. Eben. (Balestriere Aff. ¶ 58). Plaintiff supports its request with billing documentation demonstrating that its personnel spent about 110 hours on matters that included the sanctions motion, which yielded presumptive fees amounting to $41,040.00. (Natale Aff., Ex. 3). By way of explanation for the substantial difference between the amount documented and the amount requested, plaintiff reports that "staff billing entries sometimes reflect the total hours spent on multiple tasks within a single entry;" therefore, plaintiff "conservatively estimate[s]" that one

quarter of the listed staff hours involved the matter of defendant Eben's spoliation. (Balestriere Aff. ¶ 59).

In its accounting for the time spent on the litigation of the sanctions motion, plaintiff documents the following staff hours and rates:

1.   47.2 hours by four attorneys, at rates from $355.00 to $820.00 an hour, for a total of $25,083.50,[28]

2.   42 hours by two "legal apprentices," at $265.00 per hour, for a total of $11,130.00,[29] and

3.   19.7 hours by one "legal analyst," at $245.00 per hour, for a total of $4,826.50.[30]

(Natale Aff. Ex. 3, 6, see also infra, Table 4). Hours listed are summations from the daily listings of hours logged by each staff member. (Natale Aff., Ex. 3). Once again, plaintiff provides no documentation of the qualifications or experience of the billing individuals other than Mr. Balestriere.

---

[28] The attorneys listed are: Jacob Aronauer, attorney; John Balestriere, partner; Jillian McNeil, attorney; and Kurt Krautheim, attorney. (Natale Aff., Ex. 3, 6).

[29] The "legal apprentices" listed are Jared S. Kramer and Mike Y. Zhang. (Natale Aff., Ex. 3, 6).

[30] The "legal analyst" is Philip G. Menchaca. (Natale Aff., Ex. 3, 6).

Rule 37(b)(2) requires the court to award the prevailing movant the reasonable expenses, including attorney's fees, caused by the violations, unless the opposing party position was "substantially justified or [] other circumstances made such an award unjust." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 106-07 (2d Cir. 2002)(quoting Fed. R. Civ. P. 37(b)). Since Eben plainly violated the rules of discovery through his destruction of evidence and there are no mitigating considerations, plaintiff is owed its reasonable expenses, including fees, in litigating this discovery dispute. Balestriere, 2014 WL 929813 at *30. Moreover, the calculation of expenses under Rule 37 is ordinarily accomplished through a lodestar analysis. Underdog Trucking, L.L.C. v. Verizon Servs. Corp., 276 F.R.D. 105, 108 (S.D.N.Y. 2011)(citing Monaghan v. SZS 33 Assocs., L.P., 154 F.R.D. 78, 83-85 (S.D.N.Y. 1994) (applying lodestar method to determine attorney's fees for Rule 37 motion)); Bey v. City of New York, 2007 WL 1771557, *4 (S.D.N.Y. June 18, 2007)("The amount of attorney's fees to be charged to defendants for their violation of Rule 37(d) shall be determined by the lodestar analysis. . . ." (citing LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763-64 (2d Cir. 1998)).

48

**A. Reasonable Rates for Plaintiff's Personnel**


Plaintiff offers no evidence as to the qualifications or experience of any of the fee billers other than Mr. Balestriere. We are of course familiar with the litigation, including the performance of counsel, and have no reason to deviate from the hourly rates that we applied on plaintiff's <u>quantum</u> <u>meruit</u> claims. Mr. Balestriere will be compensated at a rate of $350.00 per hour, and the other attorneys at rates of $200.00 per hour. Non-lawyer time will be assessed at $50.00 per hour.


**B.   Reasonable Hours and Fees for the Discovery Dispute**


Plaintiff has submitted itemized time records that reasonably describe staff efforts related to various discovery disputes and conform to our expectations, given our knowledge of the relevant proceedings. (Natale Aff., Ex. 3). Additionally, plaintiff has represented that because the work described involved multiple disputes other than the sanctions motion, it requests only 25 percent of the 108.9 documented hours. (Balestriere Aff. ¶¶ 58-59).


We find for plaintiff in the amount of $3,802.50. <u>See</u> Table 4 <u>infra</u>. This amount represents an unreduced total of 27.225 hours at

49

the approved rates.[31]

Table 4: Rule 37 Expenses

| | | **Rule 37 Expenses** | | | | |
|---|---|---|---|---|---|---|
| | | Original | Original | | Revised | |
| | Position | Hours | Rate | Original Fee | Rate | Revised Fee |
| JA | Attorney | 0.2 | 375 | $75.00 | 200 | $40.00 |
| JB | Attorney | 17.9 | 820 | $14,678.00 | 350 | $6,265.00 |
| JM | Attorney | 28.2 | 355 | $10,011.00 | 200 | $5,640.00 |
| JSK | Legal Apprentice | 39.5 | 265 | $10,467.50 | 50 | $1,975.00 |
| KK | Attorney | 0.9 | 355 | $319.50 | 200 | $180.00 |
| MYZ | Legal Apprentice | 2.5 | 265 | $662.50 | 50 | $125.00 |
| PGM | Paralegal | 19.7 | 245 | $4,826.50 | 50 | $985.00 |
| TOTALS | | 108.9 | | $41,040.00 | | $15,210.00 |
| | 25% of Total | 27.225 | | $10,260.00 | | $3,802.50 |

**<u>CONCLUSION</u>**

Having reviewed plaintiff's proffers for this inquest, and having applied what we deem to be the most appropriate method for arriving at a <u>quantum</u> <u>meruit</u> valuation of services rendered by plaintiff, we conclude

1. that the plaintiff performed services for defendant CMA in connection with potential commodities transactions with a value of $88,324.50,

---

[31] Plaintiff has not requested reimbursement of disbursements in addition to fees.

2.  that plaintiff is entitled to an award of $273.33 in expenses related to these services,

3.  that plaintiff performed services for CMA in connection with the Wachovia litigation with a value of $24,923.70,

4.  that plaintiff is entitled to an award of $711.33 in expense related to these services, and

5.  that interest on the quantum meruit recoveries totals $35,991.65.

The quantum meruit valuation is against defendant CMA. Since plaintiff admits to having already received $252,000.00 in payment of fees on behalf of CMA, it is not entitled to any further payment by CMA on its quantum meruit claim as a consequence of our findings.

Plaintiff is awarded $3,802.50 in Rule 37 motion expenses against defendant Eben.

Dated:    New York, New York
          December 31, 2014

                              SO ORDERED.


                              _____
                              **MICHAEL H. DOLINGER**
                              **UNITED STATES MAGISTRATE JUDGE**


     Copies of the foregoing Memorandum and Opinion have been
mailed today to:


John Balestriere, Esq.
Jillian McNeil, Esq.
Balestriere Fariello
225 Broadway, Suite 2900
New York, NY 10007
Fax: (212) 208-2613

Andrew M. Friedman, Esq.
Friedman, Khafif & Sanchez, LLP
16 Court Street, Suite 2600
Brooklyn, NY 11241
Fax: (718) 797-4304

Mr. Gunter Eben
89 Longview Drive
Emerson, NJ 07630

CMA Trading, Inc.
297-101 Kinderkamack Road
Oradell, NJ 07649
Fax: (201) 261-1941